Wayne DECKER, Ernest Eldredge and Max Williams, Appellants,

v.

William J. KORTH, individually and as Collector of Internal Revenue, District of Utah, Appellee.

Wesley F. MULLETT, Appellant,

v.

William J. KORTH, individually and as Collector of Internal Revenue, District of Utah, Appellee.

Frank J. MULLETT, Appellant,

v.

William J. KORTH, individually and as Collector of Internal Revenue, District of Utah, Appellee.

Harold COMER, Appellant,

v.

William J. KORTH, individually and as Collector of Internal Revenue, District of Utah, Appellee.

Leo WEIBEL, Appellant,

v.

William J. KORTH, individually and as Collector of Internal Revenue, District of Utah, Appellee.

Nos. 4754–4758.

United States Court of Appeals, Tenth Circuit.

Feb. 8, 1955.

Rehearing Denied March 16, 1955.

Glenn E. Fuller, Salt Lake City, Utah (Jack R. Decker, Shirley P. Jones and Shirley P. Jones, Jr., Salt Lake City, Utah, on the brief), for appellants.

Alonzo W. Watson, Jr., Sp. Asst. to Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack and Lee A. Jackson, Sp. Assts. to Atty. Gen., and A. Pratt Kesler, U. S. Atty., Salt Lake City, Utah, on the brief), for appellee.

Before PHILLIPS, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

HUXMAN, Circuit Judge.

The appeals in these five cases involve the assessment of excise tax deficiencies and fraud penalties for the years 1942, 1943 and 1944 against appellants who were engaged in jewelry businesses. The cases were consolidated for trial in the court below and are presented here on a consolidated record. The issues and questions in the last four cases are identical and they will be considered together. Case Number 4754 presents a different question and it will be separately considered.

### Cases Numbers 4755, 4756, 4757 and 4758.

The general statements in these four cases with respect to the manner in which the businesses were being conducted, books and records kept, and other general operations have equal application to case Number 4754. Wayne Decker, one of the appellants in Number 4754, plays the leading role in all five cases. He was in the jewelry business in Salt Lake City, Utah, and largely financed the jewelry businesses operated by the other appellants. The Mullett Jewelry Company and the Mitchell Jewelry Company were both located in Provo, Utah. Another Mullett Jewelry Store was located in Cedar City, Utah. A fourth store, the Jewel Box, was located in Logan, Utah, and a fifth store, the Dixie Jewel Shop, was located in St. George, Utah. Frank J. Mullett was a partner in the Mullett Jewelry Store and the Mitchell Jewelry Store in Provo and operated the Mullett Jewelry Store. The Mitchell Jewelry Store was managed by W. E. Mitchell. Wesley F. Mullett operated the Mullett Jewelry Store in Cedar City. Harold Comer operated the Jewel Box at Logan, Utah. Leo Weibel operated the Jewelry Store in St. George. Ernest B. Eldredge was a partner with Wayne Decker in the Jewelry Store in Salt Lake City, involved in case Number 4754. The books and records for all the stores were kept by Decker in Salt Lake City and he also prepared most of the excise tax returns filed by the appellants

for the businesses for the tax years in question.

In the spring of 1945, the Collector of Internal Revenue for the District of Utah began investigation of appellants' businesses. The investigation was carried on largely by Special Agent, Daniel M. Smith. During the course of his investigation he attempted to gain as much information as possible from appellants concerning the total amount of their sales for the years in question, in order to determine whether the amount they reported for excise tax purposes was correct. He contacted and discussed with them their business operations and their relationship with Decker. He secured from them whatever sales tickets, purchase agreements, check stubs, or other accounting data they had. He examined and analyzed this accounting data and discussed with the taxpayers questions concerning the proper interpretation of the information. He also obtained and inspected bank ledger cards carried in the names of certain taxpayers. The information shown on these ledger cards was discussed with the taxpayers in order that the relationship between the business earnings and deposits and between certain withdrawals might be properly understood and interpreted.

Sworn statements were secured from all appellants as part of the investigation. The first of such statements was given by Decker on June 1, 1945. This statement related to the operation of the Mullet and Mitchell Jewelry Stores in Provo, Utah. In the two statements concerning these stores, Decker denied that the businesses were being operated as partnerships. On the next day he sought out the revenue agents and told them that he wanted to change his story. On his request, an additional sworn statement was taken from him in which he stated not only the Mullett and Mitchell Stores but also the Dixie Jewel Shop, the Mullett Jewelry Company in Cedar City, and the Jewel Box were operated as partnerships. He stated the partnerships were formed some time in 1942 or 1943 and that under the arrangement the profits from the businesses were split equally after the managing partners' monthly drawings were deducted. All the managing partners in their respective sworn statements acknowledged the partnership arrangement with Decker and further stated that Decker prepared their income tax returns on which they were represented as sole proprietors of the business, when in fact they knew they were not such sole proprietors.

As a result of the investigation, notices and demands for additional excise taxes, penalties and interest were mailed to Decker on February 12, 1948. Copies of these notices and demands were not mailed to the other taxpayers. The notices and demands set forth separately the additional tax claimed due, the penalty and interest thereon, and the total amount claimed to be due. After a request by Decker's representative to extend the time, nothing further was done until July 13, 1948, when the same forms except for date were sent to Decker. Shortly thereafter he filed an action in the Utah Federal District Court seeking to enjoin the collection of the taxes, interest and penalties covered by the notices and demands of February 12, and July 13, on the ground that he was not a partner and did not owe the taxes. A temporary restraining order was entered with the suggestion that the Government attempt to collect the taxes from the other taxpayers.

Thereafter, on December 9, 1948, notices and demands for the taxes and penalties were sent to the other four taxpayers who paid them from funds furnished by Decker. The injunction proceeding in the District Court was thereafter dismissed. Claims for refunds were filed by appellants with the Commissioner of Internal Revenue and, such claims not having been honored, in due course these actions were filed to recover the amounts so paid.

Each of the five complaints alleged that the excise taxes and fraud penalties were illegally and erroneously assessed and collected; that improper notices and demands for the taxes and penalties had

been made; that inadequate information concerning taxes allocable to particular tax periods had been furnished; that the assessment and collection of the taxes, penalties and interest were illegal and void for the reason that the statute of limitations had run; that the notices and demands were not made as required by Section 3312 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3312; that the procedure followed was void because the procedure prescribed by the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., had not been followed and that there was no authority for the collection of the penalties.

The Collector entered a general denial of all these allegations and affirmatively asserted the defense of fraud for the tax years involved, alleging that no monthly partnership returns were filed as required by law, reporting the taxes due upon the sales of jewelry; that returns for certain months were not verified as required by law; that taxpayers wilfully and knowingly attempted to defeat and evade a large part of the taxes due by failing to file certain returns and by filing false and fraudulent returns; that taxpayers knowingly reported their taxable sales as being considerably less than actual sales; that the true picture of taxable sales was distorted because substantial costs of sales were shown on taxpayers' books as costs of repairs and that Decker knowingly and wilfully failed to keep proper and adequate books for the partnership businesses.

Taxpayers moved for directed verdicts in regard to the fraud penalties for the year 1944 because fraud had not been pleaded with particularity. Similar motions were made for the years 1942 and 1943. These motions were denied. Upon trial by a jury, a general verdict was rendered against taxpayers. Judgments were entered thereon and these appeals followed.

While a number of issues are presented by these appeals, the main issue centers around appellants' contention that the Collector failed to make a case for the assessment of fraud penalties. Appellants center their attack upon the method employed by the Collector to establish sales other than those reported by appellants. They strenuously argue that in reconstructing appellants' total sales the Collector made no allowance for depreciation or loss resulting from merchandise which was either broken, lost, depreciated in value, or which had lost all value.

We start with the fact that appellants kept only fragmentary records. They kept no complete set of books, no beginning or closing inventories. They kept no depreciation account or record of merchandise lost, stolen, depreciated in value, or having lost all value. The Collector was hard put to reconstruct appellants' financial structure from the fragmentary records available to him in order to determine gross sales.

Decker made out all the excise tax returns for the various stores except one. He also made out all the taxpayers' income tax returns for the years in question. He kept the books for all the stores at his place of business in Salt Lake City, Utah. Taxpayers sent in information either once or twice a month. This information generally consisted of summaries of sales, amount of cash received from either sales or collections, paid-outs and occasionally cancelled checks and break-downs on excise and sales taxes. Decker stated that his books accurately and completely represented the information sent to him. The records for the W. E. Mitchell Jewelry Company and the F. J. Mullett Jewelry Company of Provo, Utah, for the year 1942 were missing. The records kept by Decker consisted only of ledger accounts and contained only monthly entries and annual totals for each store. He did not retain the data sent to him each month from which the information was taken that was entered in the ledger.

The information sent to Decker by the other appellants was destroyed by him and with one exception the other appellants did not make or retain copies of any monthly reports sent to Decker and in that one exception the summarized list sent to Decker did not contain all the

sales. Complete sales tickets for one full year were available from only one store, the Dixie Jewel Shop, for 1943. The sales shown on these tickets were considerably in excess of the sales shown on Decker's books. The evidence further shows that in many instances merchandise sales were shown as repairs, not subject to excise taxes. Sales shown for years after the investigation began were considerably in excess of those for the years in question. Bank deposits made solely from business profits showed that the business had larger profits than what was shown on Decker's books. The inventories reported for the years following the investigation were many times greater than for the years in question.

Faced with these facts and with wholly incomplete and fragmentary records, the Collector was faced with the necessity of reconstructing the picture of total sales as best he could. The method employed by the Collector was as follows. He took the cost of goods sold as reflected by the books of appellants and applied thereto a mark-up percentage which was obtained from an examination of the sales tickets available to him. Each sale ticket had written on it a code number which represented the cost to the dealer at that time. By dividing the difference between the cost of that item and the total selling price by the cost of the item, the Collector obtained what is called a mark-up percentage. Since he did not have nearly all the sales tickets for the years in question and since the evidence showed that the gross sales reported by appellants for excise tax purposes were much less than actual gross sales, the Collector applied the mark-up percentage to the cost of goods sold as reported by appellants to obtain a sales figure more nearly in line with actual sales. Collector Smith did compute and make some allowance for repairs. Otherwise he made no allowance for shrinkage losses.

█ It is obvious that his method was erroneous to the extent that it did not allow something for shrinkage. Shrinkage includes freight and handling cost. It also includes items of merchandise which have been stolen, used in advertising, or which have become broken or lost. It also includes values which have been eliminated from the inventory by "mark-downs." We think we may take judicial knowledge that shrinkage does occur in all merchandising businesses.

██ While it may be conceded that there was a margin of error in the Collector's method, it does not follow that a reversal must follow therefrom. These were suits to recover money paid under protest. In such an action the taxpayer must not only show that the Commissioner was wrong but he must further show the amount he is entitled to recover. In other words, he must establish the facts from which a correct determination of his tax liability can be made.[1] This principle is well stated in Taylor v. Commissioner, 2 Cir., 70 F.2d 619, 621, as follows, "But the reason for this is obvious; a plaintiff, seeking an affirmative judgment measured in dollars, must prove how much is due. His claim is for money paid and he must show that every dollar he recovers is unjustly withheld. So it is not enough merely to prove that the tax as a whole was unlawful; some of the dollars he paid may nevertheless have been due."

█ Appellants completely failed to establish by competent evidence the amount of shrinkage incurred in these businesses. They had no records or factual testimony showing shrinkage losses for the years in question. Their statement that shrinkage amounted to 20% was not based upon facts. It was not taken from sales or any records which they kept. It merely constituted their opinion and conclusions as to what the percentage of shrinkage should be. Such

1. Reinecke v. Spalding, 280 U.S. 227, 50 S.Ct. 96, 74 L.Ed. 385; Harvey v. Early, 4 Cir., 189 F.2d 169; Maroosis v. Smyth, 9 Cir., 187 F.2d 228. Lewis v. Reynolds, 10 Cir., 48 F.2d 515, affirmed 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293.

statements are self-serving declarations. If a taxpayers' books failed to reflect certain essential facts, he must suffer the consequences.[2]

That appellants greatly understated their total sales in their income tax returns is obvious from the record. Thus Frank J. Mullett could not explain why the combined inventories for the Mullett Jewelry Company and the Mitchell Jewelry Company at Provo in his 1944 tax return was approximately $5,000, when the tax return for the year 1945, after the investigation was under way, showed an inventory for the two stores of over $31,000. Decker's books showed cost of repairs for the last six months of 1944 to be $8,813, while his check stubs showed the repairs to be only $2,719. W. E. Mitchell, who operated the jewelry company store at Provo, testified that he made a report of every sale and that he had sent Decker a report showing the amount of sales, the cost of sales, accounts receivable, and cost of repairs. He could not explain why Decker's books showed his cost of merchandise for the last six months of 1944 to be $8,929, when his check stubs for the same period showed merchandise purchases totalling $17,650. The witness could not recall whether his inventory was $1,560 at the end of 1942 and $2,357 at the end of 1943, as shown on his tax returns for those years. After reviewing his sworn testimony taken at the time of the investigation, the witness remembered that he had then stated that his inventory in each of those years was about $5,000 or $6,000. He could not explain why his inventory, as shown on his 1944 tax return, was $2,316 at the end of that year and on the 1945 partnership return it was shown as $17,000.

The taxpayers urge that the court erred in excluding certain evidence relating to accounting practices and, in lieu thereof, instructing the jury that it was taking judicial notice of proper accounting principles. They assert that taxpayer Comer's testimony was excluded to their prejudice. An examination of his entire testimony shows that the only part of his testimony which was excluded was that wherein he attempted to explain accounting procedure employed by someone else in keeping books, of which he manifestly had no personal knowledge. Neither did the court prevent taxpayer's accountant, Pinnock, from testifying with respect to data reflected in their books. He was only restricted in his testimony when he undertook to draw conclusions from facts not in the record. The court's statement that it would take judicial notice of accounting procedure did not preclude taxpayers from disputing the court's opinion with respect to such procedure by offering competent evidence. The difficulty with appellants' testimony along this line was that it referred to non-factual self-serving conclusions based entirely upon speculation.

Appellants complain of the court's instructions to the jury and under this assignment list twelve instructions which they claim were erroneous. There is much in appellee's contention that appellants' objections to these instructions were too general and too vague to call the court's attention to the alleged errors in compliance with Rule 51 of the Rules of Civil Procedure, 28 U.S.C.A., and that the errors now urged with respect to the court's instructions were not the errors assigned in their objections thereto in the trial court. Nevertheless, we have examined the court's instructions in light of the record and are of the conclusion that they correctly framed the issues on the evidence presented in the trial. Analyzing each instruction and setting out the evidence applicable thereto would only unduly extend this opinion which of necessity must be long. Instructions must be predicated on the evidence. They may not deal with general or abstract propositions not immediately connected with and applicable to the facts before the jury. We think the court's instructions met this test. Furthermore, one may not assign a the-

2. Bergdoll v. Pollock, 95 U.S. 337, 24 L. Ed. 512; Maroosis v. Smyth, 9 Cir., 187 F.2d 228.

ory which is unsupported by evidence.[3] The difficulty with appellants' theory as to shrinkage and their request for instructions thereon is there was no evidence to support it. Their whole case with respect to shrinkage was predicated upon a theory and pure speculation.

 It is contended that the Collector's answers and amendments thereto did not properly plead fraud and that, therefore, the court erred in refusing to strike the amended answers. The Collector admitted that he did not plead in his answer or the amendments thereto any additional facts of fraud for the year 1944. However, an analysis of the answer and the amendments thereto show that they fully set out facts relied upon to establish fraud for the years 1942 and 1943. Appellants were not unduly surprised and suffered no prejudice for the year 1944, since the Collector's amended answers alleged certain of the facts upon which he relied in assessing the fraud penalties for the year 1944, and taxpayers had been supplied with certain of the data upon which fraud penalties for that year had been predicated. So also the evidence upon which the Collector relied to establish fraud was introduced in evidence and the trial court ruled that the pleadings could be amended to conform to the proof, pursuant to Rule 15(b), Federal Rules of Civil Procedure. Failure to formally amend the pleadings will not jeopardize a verdict or judgment based upon competent evidence. If an amendment to the pleadings to conform to the proof should have been made, the Courts of Appeals will presume that it is so made to support the judgment.[4]

 It is further contended that the additional excise tax assessments are void because in making them the Collector failed to comply with the procedure published in the Federal Register in compliance with the Administrative Procedure Act. The Administrative Procedure Act, 5 U.S.C.A. § 1002 requires that every agency shall publish in the Federal Register the "nature and requirements of all formal or informal procedures" and "substantive rules * * * and statements of general policy or interpretations formulated * * * for the guidance of the public." The Bureau of Internal Revenue published its procedure relative to excise taxes in the Federal Register September 11, 1946, Vol. II, No. 179 A–49, § 601.6, prescribing the issuance of a 15-day preliminary letter to the taxpayer allowing him an opportunity to submit a protest or to request a conference. This procedure was not complied with. The Collector, however, proceeded in reliance on Section 3312(b) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3312(b), which provides that "In case of a false or fraudulent return with intent to evade tax, or of a failure to file a return within the time required by law, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time." The Commissioner alleged and relied upon the fact that these returns and failure to make returns were fraudulent. If under Section 3312(b) he could bring a proceeding in court without even making an assessment at any time, or if he could assess a tax without notice, it follows that the requirement for a fifteen-day letter to the taxpayer had no application. It has also been held that an irregularity as to the procedure or time of making an assessment of a deficiency tax will not render the assessment void.[5]

---

3. Mitchell v. Potomac Ins. Co., 183 U.S. 42, 22 S.Ct. 22, 46 L.Ed. 74; Rhett v. Poe, 2 How. 457, 43 U.S. 457, 11 L.Ed. 338; Indianapolis & St. L. R. R. Co. v. Horst, 93 U.S. 291, 23 L.Ed. 898; McCarthy v. Pennsylvania R. Co., 7 Cir., 156 F.2d 877; Loew's Inc., v. Cole, 9 Cir., 185 F.2d 641.

4. Ruud v. American Packing & Provision Co., 9 Cir., 177 F.2d 538; Hansen v. Creedon, 8 Cir., 163 F.2d 223; Underwriters Salvage Co. v. Davis & Shaw Furniture Co., 10 Cir., 198 F.2d 450.

5. Thomaston Cotton Mills v. Rose, 5 Cir., 62 F.2d 982; Lehigh Portland Cement Co. v. United States, 30 F.Supp. 217, 90 Ct.Cl. 36.

■ Appellants assert error with respect to the court's instruction as to the statute of limitations. Their position is somewhat difficult to understand. They state whether the statute of limitations has run is a matter of law and that the court erred in submitting the matter to the jury and instructing it with respect thereto. We have read the court's instruction and think it was not only proper but necessary. Obviously, the four-year statute of limitations had run with regard to the assessment of 1942 and 1943, unless there was fraud, which tolled the running of the statute of limitations. Whether there was such fraud was a question of fact for the jury's determination. The court properly instructed the jury that the statute of limitations would be a bar unless it found that there was fraud, in which event, the statute of limitations had no application.

■ There is no merit whatever to taxpayers' contention that the dismissal of the injunction suit, Civil No. 1498, brought by Decker to enjoin the collection from him of the assessments for the taxes and penalties therein alleged to be due from these taxpayers, is res judicata, and hence determinative of that issue in the instant case. That suit was instituted by Decker on the theory that he was not a partner in these enterprises and, therefore, there was no tax due from him. Upon that allegation, the court entered a temporary restraining order and suggested that the Government proceed to seek a collection of the tax from the remaining appellants. Apparently when it was established by the affidavits of Decker and the remaining appellants that he was a partner with them, that suit was dismissed upon a stipulation filed by the parties because the issue raised was moot. The issue to which reference was had was that Decker was not a partner. That case in nowise undertook to determine tax liability on the part of Decker or any of the other appellants and, therefore, cannot be res judicata of the issues raised in this proceeding.

. In a supplement to their brief, appellants contend that in case Number 4758 the Collector for the year 1943 used a completely different method of assessment. This assertion is predicated upon a disputed issue of fact as to the sales slips which were used and considered by Smith in making his computation. Without belabouring the question, it is sufficient to say that the contention is without substantial merit.

### Number 4754.

■ The basic issues in this case are the same as in the other cases and the decision with respect thereto is controlled by what has been said in those cases. In this case the additional excise tax and fraud penalty was assessed because of the sale of one diamond ring. It was alleged that the Decker Jewelry Company fraudulently failed to report and pay the excise tax due and owing on a diamond ring sold to a Dr. Raile for his wife. Two questions were submitted to the jury. Did a sale occur and, if it did, did it take place before April 1, 1944, or thereafter?[6]

Decker took the position that no sale in fact occurred; that at most there was a conditional sale with a right on Dr. Raile's part to return the ring if his wife was dissatisfied with it and receive a return of his money. That was an issue of fact submitted to the jury and resolved against Decker and we think rightly so.

The undisputed evidence is that the transaction occurred some time in 1944. Dr. Raile testified that as he remembered it some time in April he saw where the excise tax was to be increased to 20%; that he conferred with a Mr. Williams of the Decker Jewelry Company in April about the purchase of a ring at a time he thought was prior to the date of the increase of the excise tax; that a few days later he and Mrs. Raile appeared at the

6. On April 1, 1944, the excise tax on such sales was increased from 10% to 20%.

store and picked out the diamond ring; that he gave his check for $1,000 and a few days later picked up the ring and paid the balance. He testified it was understood that if they did not like the ring they could return it and their money would be refunded. They kept the ring for four years, then returned it and received repayment of the purchase price. The checks which he gave were not available and were not produced in evidence, but a deposit slip by the Jewelry Company dated May 23, 1944, listed a check by H. Raile for $1,000, and the deposit slip for May 24, 1944, listed a check by Henry Raile, M.D., for $922.

Eldredge testified that when Dr. Raile's checks were cashed, the money was placed in the till and that right after the checks went through an amount equal to the two checks was placed in an envelope to be held until Dr. Raile decided whether they would keep the ring. When the ring was returned four years later, the money in the envelope was returned to Dr. Raile. There is evidence from which the jury could have concluded that the money could not have been placed in the envelope in April, or even in May, 1944. The envelope contained bills signed by John W. Snyder, as Secretary of the Treasury. He was not appointed until June 25, 1946, and his signature could not have been placed on bills until after that date. The envelope also contained bills bearing the signature of Fred M. Vinson, as Secretary of the Treasury, who was not appointed as such until June 23, 1945. On further questioning by the court, Dr. Raile testified that he understood that he had bought the ring but that he further understood he could return it if he did not like it. In response to the following question by the court, "But you understood that you had bought and paid for it, and it was your ring, and you understood that when you gave it to your wife?", he answered, "Naturally so." He further testified that he probably would not have returned the ring had he not first been approached by Decker. Under this limited outline of the evidence, there certainly was an issue of fact whether a sale had occurred and the date thereof to be submitted to the jury for its determination.

We think the complaint with respect to the court's instruction of what constitutes a sale is without merit. When the entire instruction is read, it correctly advised the jury as to the elements constituting a sale. The court's statement that "The ring must have been delivered to the purchaser" and "must have been partly paid for" before April 1, 1944, has reference only to the issue of what the tax rate applicable to the sale should be, if the jury found there was a sale of the ring.

We have tried to give careful consideration to the complicated record. It is our considered judgment that there is no reversible error. The several judgments appealed from in Numbers 4754—Wayne Decker, Ernest Eldredge and Max Williams v. William J. Korth, 4755—Wesley F. Mullet v. William J. Korth, 4756—Frank J. Mullett v. William J. Korth, 4757—Harold Comer v. William J. Korth, and 4758—Leo Weibel v. William J. Korth, are severally affirmed.